**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| AMERICAN TISSUE, INC., *et al.*, | ) | Case No. 01-10370 (WS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Re: Docket No. 3748** |

**MEMORANDUM OPINION WITH RESPECT TO THE MOTION OF NATIONAL RECOVERY SERVICES, INC. FOR ALLOWANCE AND PAYMENT OF CHAPTER 7 ADMINISTRATIVE EXPENSE**[1]

Before the Court is the motion of National Recovery Systems, Inc. ("NRS") for allowance and payment of its claimed chapter 7 administrative expense [Docket No. 3748] (the "Motion"). For the reasons set forth below, the Court grants the Motion.

FACTS

NRS's primary business is tracking and monitoring antitrust class action litigation and seeking contracts with possible members of a class who might be entitled to some recovery whom they assist in preparing and filing claims. For their services, NRS receives compensation in the form of a percentage of any actual monetary recovery. In this case NRS was monitoring the so-called Linerboard antitrust litigation (the "Litigation"). NRS contacted some 2,250 different entities who it thought might be claimants incident to a class action settlement in that case. Among them was the Chapter 7 Trustee (the "Trustee") of the Debtors, whom NRS contacted in May 2004, close to the Litigation settlement's extended claims filing deadline of May 15, 2004. The Trustee was not actually aware of the Litigation or any rights the Debtors might have incident to it.

---

[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

After consultation with Counsel, reasoning she really had nothing to lose, the Trustee signed a contract with NRS on May 17, 2004 (the "Contract"). The basic contract form had been prepared by NRS, but was augmented by the Trustee's Counsel's insertion of a clause requiring bankruptcy court approval of the Contract after notice. The Contract provided that NRS's compensation would be one-third (1/3) of any recovery. At the time, the May 15, 2004 claims bar date was discussed, as was the fact that the Debtors' records were such that the Trustee would not and/or could not be helpful or expend estate resources in obtaining the pertinent facts necessary to document the claim (*i.e.*, purchases made by the Debtors from the antitrust defendants between October 1, 1993 and November 30, 1995). It was understood that NRS would obtain the necessary information, prepare the claim, etc. It was also discussed and understood that the Trustee would prepare and file any papers necessary to obtain Court approval of the arrangement pursuant to the Contract provision requiring such.[2]

As the claims deadline had just expired, a protective, cursory claim was filed almost immediately, and then NRS went about trying to reconstruct the Debtors' purchases and other data necessary to file a more complete claim. By November 2004, NRS had compiled enough additional information and in fact filed an amended claim on December 2, 2004.

When the Contract was signed, the parties did not know and apparently could not estimate the Debtors' potential recovery primarily because (1) the extent of Debtors' purchases from the antitrust defendants was unknown (*i.e.*, the amount of the Trustee's claim), and (2) the

[2] It is noteworthy that according to the Debtors' filed claim, NRS used Schedule F of the Debtors' chapter 11 bankruptcy filing to estimate the Trustee's proof of claim in the Litigation. Testimony also indicated that some of the information documenting the claim resulted from NRS's efforts to access records or information from the antitrust litigation defendants themselves.

number and/or amounts of claims filed by all claimants and allowed against the fixed settlement fund was unclear. The same was likely true at the time of the December 2004 filing of the amended proof of claim.

The Trustee did not seek Court approval of the Contract until February 4, 2005, when she filed an application to employ NRS as one of her professionals pursuant to sections 327 and 328 of the Bankruptcy Code[3] (the "Application to Employ"). It is not clear why the Trustee waited some eight or more months before doing so. The U.S. Trustee ("UST") opposed the Application to Employ on various grounds. As a result of that opposition and apparent indications that the UST was prepared to strenuously litigate and appeal its opposition if need be, the Trustee withdrew the Application to Employ by notice dated March 2, 2005. Around that time or shortly thereafter, the Trustee actually received a check from the antitrust litigation class action claims administrator in the amount of $142,276.99 in payment of the Trustee's filed claim. One-third of that amount, $47,225.66, which NRS seeks pursuant to the Motion, seeking its allowance primarily as an administrative expense claim.

The Trustee does not oppose the Motion, but the UST does. The UST objects on the grounds that: (a) NRS is a "professional" within the meaning of the Code, and since no approval of the Contract or NRS's retention was ever obtained under section 327 (and when sought, was withdrawn before disposition), NRS is simply not entitled to any compensation at all (this Circuit having enunciated strong views on that subject, *see In re Fleming Companies, Inc.*, 305 B.R. 389, 392 (Bankr. D. Del. 2004)); (b) as a professional, NRS cannot "evade" the professional

---

[3] Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code (the "Code"), 11 U.S.C. § 101, *et seq.*

approval requirements of sections 327 and 330 by filing an administrative expense claim for the same amount and for the same services under section 503(a) and (b), *see F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 108-09 (3d Cir. 1988), *cert. denied*, 488 U.S. 852 (1988)); (c) there is no pending application to employ NRS as a professional, even on a *nunc pro tunc* basis, and even if there were, it could only be made retroactive to a point where all of the services involved had already been completely performed; and (d) the amount sought by NRS is unreasonably high in light of the hours actually spent on the matter, even if the administrative expense claim is allowable under section 503.

NRS argues, among other things, that it is not a "professional" within the meaning of that term in the applicable Code provisions, and its services and the subsequent result meet all of the section 503(a) and (b) requirements for allowance of an administrative expense; and further, under the circumstances it would be totally unfair to deny compensation.

DISCUSSION

Section 327(a) provides:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 328(a). The Bankruptcy Code does not specifically define the term "professional."

"Professional" is generally defined as: "A person who belongs to a learned profession or whose occupation requires a high level of training and proficiency." Black's Law Dictionary 1226 (7th ed. 1999). The Code, mentioning as it does attorneys, accountants, appraisers and auctioneers, as examples of covered "professionals" would thereby seem to thus indicate the term

"professional" encompasses those whose status or activities or other attributes are analogous to those of the examples given. Courts have used two different, but overlapping, approaches for defining a "professional" within the meaning of section 327. *In re First Merchants Acceptance Corp.*, 1997 WL 873551, at *2 (D. Del. 1997). Some courts limit the definition "to those occupations that play a central role in the administration" of the bankruptcy proceeding. *Id.* Other courts define a "professional" as those who are given "discretion or autonomy in some part of administration of the debtor's estate." *Id.* In making the determination of whether an entity or person is a "professional," courts have stated the following factors should be considered:

> (1) whether the employee controls, manages, administers, invests, purchases or sells assets that are significant to the debtor's reorganization, (2) whether the employee is involved in negotiating the terms of a Plan of Reorganization, (3) whether the employment is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations; (4) whether the employee is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate, . . . , (5) the extent of the employee's involvement in the administration of the debtor's estate, . . . and (6) whether the employee's services involve some degree of special knowledge or skill, such that the employee can be considered a "professional" within the ordinary meaning of the term.

*Id.*, at *3 (internal citations omitted).[4] In the end, the inquiry requires an examination of the type of duties to be performed by the employee and whether any special skills or training are necessary to carry out these duties. *Id.*, at *2; *In re Metropolitan Hospital*, 119 B.R. 910, 916 (Bankr. E.D. Pa. 1990).

---

[4] Examples of those found to be "professionals" include: appraisers and auctioneers, airplane brokers, credit adjustment companies, media brokers, financial consultants, public relations firms, oil and gas consultants, lobbyists and property managers. *In re Metropolitan Hospital*, 119 B.R. 910, 916 (Bankr. E.D. Pa. 1990) (citations omitted). Examples of jobs that do not qualify as "professionals" include: fire insurance adjusters, collection agencies and property finders. *Id.*; *In re Taylor*, 216 B.R. 515 (Bankr. E.D. 1998). NRS is much closer to the latter than the former.

The six factors enumerated in *First Merchants Acceptance* militate against finding that NRS is a professional in this bankruptcy case. It is worth noting that this is a chapter 7 case, and thus many of the recited factors, dealing as they do with reorganization, might not be relevant. Even in the chapter 7 context, NRS did not control or manage assets significant to the bankruptcy estate, as the amount recovered in the Litigation settlement was relatively small. NRS's activities did not implicate independent professional judgment or advice and its involvement in the ongoing administration of the estate was extremely limited; NRS was not given nor did it have any real discretion or autonomy.

The Court concludes NRS is not a professional within the meaning of section 327. Generally, NRS did not play a central or significant role in the overall administration of the Debtors' estate nor have any autonomy in some part of the administration of the Debtors' estate. NRS played a relatively small and not continuing role in this case by locating and processing a specific antitrust claim on behalf of the Chapter 7 Trustee. NRS expended its own time and efforts in the hope that the Litigation claims deadline would not be strictly enforced, and researched and prepared the form(s) of that claim, which the Trustee had to review and sign incident to their submission to the antitrust claims administrator. No specialized training, education or special skills in the normal sense were involved in NRS's activities.

The UST argues that NRS had and utilized special knowledge or skill emanating from monitoring antitrust class actions and the experience gained in processing similar claims over time, and that such satisfies the special knowledge and skill requirements of a "professional" under section 327. To accept such experience alone as an marker of professionalism would turn anyone who has pursued a line of activity sufficiently long or assiduously to do it proficiently

into a "professional." In the common parlance it is often loosely said that something was done "professionally" or in a "professional" manner. In that context the reference implies that the actor is a "professional," and is more or less synonymous with "competence" or "proficiency." One should avoid that semantic trap and instead recognize that the Code provision relates to a true "professional." In this situation, once the Trustee was identified as a possible class action member, what was involved was digging out of available sources the records of the Debtors' purchases from specified vendors over a specified period and inserting that data into a required form, and doing so in a manner to maximize the likelihood of recovery and minimize the likelihood the data produced would be challenged. Normally a professional brings to the table knowledge and advice materially above and beyond that which the client possesses. If she had been so inclined, the Trustee could well and easily have done what NRS did here. The work performed by NRS, while valuable in any given situation, is not the stuff of a "professional" if that term is to retain any differentiation or real meaning at all. Proficiency gained from experience does not in and of itself make one a professional, though it is an attribute (one of a number of attributes) of a professional. More accurately described, and without denigrating it, NRS is a niche entrepreneur whose services, while potentially productive, neither involve superior intellectual attainment or heightened education, nor the heightened public and commercial recognition and consequential heightened responsibilities that tend to characterize or be hallmarks of "professionals." Relevant also is the fact that "professionals" often tend to form associations and/or accrediting bodies and attempt to subject themselves to uniform ethical and performance standards. None such as relates to the activities of NRS were brought to the Court's attention.

Having thus concluded that NRS is not a "professional" as that term is used in the Code, it was not legally necessary to obtain prior Court approval of the Trustee's arrangement with NRS under section 327. The UST, however, emphasizes the Contract provision requiring Court approval and the belated attempt to comply with it (indeed, the Trustee could be taken to task for failing to fulfill or follow through with her contractual commitment, particularly if the Court was to deny NRS its sought after compensation). In this instance, however, the Contract provision should be seen not as an impediment or bar to recovery, but rather as a protective provision added out of an excess of caution though not required by law. Such a precautionary measure should not define or characterize the true substance of what is involved , *i.e.*, to put it as a variation on a popular theme - if something does not look like a duck, and does not quack like a duck, calling it a duck does not make it one.

Interestingly, the Contract provision requires only that it be "approved by the US Bankruptcy Court, after notices to all creditors and interested parties . . . ." The Contract does not specify approval of NRS as a "professional" under section 327, although that is the route the Trustee decided to take. Even if it might be argued (which it was not) that the Contract was not in the ordinary course of the Trustee's duties, and as such required approval under the Code, to allow the Trustee to keep the claim proceeds without paying the contracted for compensation (or any compensation) under the circumstances of this case would do unacceptable violence to the strong policy expressed in section 503 of encouraging entities to do business with a debtor or trustee in order to maximize the possibility of return to unsecured creditors - especially in a case such as this where the results are tangible and the statutory criteria of benefit to the estate is clear.

Section 503(a) provides that allowed administrative expenses include "the actual,

necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after commencement of the case." 11 U.S.C. § 503(b)(1)(A). NRS's administrative claim falls within this provision because it preserved and obtained an asset of the estate, namely the antitrust claim which produced a payment of $142,276.99. The claim constituted "found" money that the Trustee was not aware of until she was contacted by NRS. The Contract and amount of compensation agreed to were within the sound business judgement of the Trustee, as she was responsible for collecting money of the estate with the best interests of creditors in mind. *See* 11 U.S.C. § 704(1). While the amount sought might seem high if one were to look only at the time spent of the assignment, collection actions on a contingency basis are well accepted in the commercial world as being a reasonable way of allocating and sharing risks and benefits, particularly where the potentially benefitting party does not wish to expend or risk economic capital in the absence of unquestionable or unknown tangible monetary results. The Contract fits that category and the Trustee should be made to adhere to its benefits and costs as written. But for the arrangement with NRS, the estate would not likely have received any recovery from the Litigation, as the Trustee was apparently not prepared to pursue the Litigation on her own.

For the stated reasons, the request for payment of the contingency fee and will be allowed as a chapter 7 administrative expense.

Dated: September 27, 2005

Honorable Walter Shapero
United States Bankruptcy Judge